# EXHIBIT 1

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
Emergency International Arbitral Tribunal

MedQuest Ltd.

        Claimant,

vs.

ICDR Case No. 01-22-0004-0989

Trivent Systems Incorporated,
Trivent Systems PVT, Ltd.,
Senguttuvan Sam Shanmugam and
Roy Dixon

        Respondents.

## INTERIM AWARD OF EMERGENCY RELIEF

I, Angela Foster, the undersigned emergency arbitrator, having been designated by the International Centre for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), and in accordance with the arbitration agreement dated March 10, 2011, entered between the above-named parties, and further pursuant to Rule 39 of the AAA Commercial Arbitration Rules, effective September 1, 2022, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, each represented by counsel, at an emergency hearing held on October 26 and October 28, 2022, do hereby, AWARD, as follows:

### I.    Background of the Dispute

In 1983, Elliot Stone created MedQuest Ltd., (hereafter, "MedQuest" or "Claimant"). MedQuest is a medico-legal expert, medical record retrieval, medical organization and summary firm. Mr. Stone formed Record Reform®, a MedQuest subsidiary which retieves, stores, analyses and summarizes medical records. Record Reform's customers are personal injury

1

lawyers who require summaries, record storage, organization and synopsis of voluminous medical records.

Trivent Systems Incorporated, a Pennsylvania corporation, and Trivent Systems PVC Ltd., an Indian company, provide medical records support services, i.e., organization of medical records, medical chronologies and summaries for law firms. Trivent Systems Incorporated, Trivent Systems Pvt, Ltd., Senguttuvan S. Sam Shanmugam and Roy Dixon, are collectively referred as "Respondents" or "Trivent".

In 2011, Claimant and Respondents entered into a cross marketing and sales agreement that provided Trivent would service MedQuest's attorney customers through the MedQuest web portal. According to the Agreement, Trivent would provide remote offshore medical services in India to review, organize and summarize the medical records provided by MedQuest's attorney customers. The Agreement allowed for MedQuest and Trivent to each open a new market for their respective services, working with each other as a one-stop shop for medical expert review.

**The Agreement**

The Agreement provides that the customers would be sourced by MedQuest. Specifically, MedQuest located and contracted customers and itemized them on an appended customer contact list. Trivent agreed to provide back-office support and process orders for MedQuest's customers through MedQuest's webpage. The Agreement provides that "Trivent shall provide MedQuest with IT assistance at no additional cost, to enable MedQuest's website to process orders for medical records support services, including delivery of completed work product and related functionalities." (Agreement, § 3.1).

Under the Agreement, Trivent agreed to provide MedQuest customers with customer support, and to provide sufficient data communications connectivity to meet their needs. Trivet

agreed not to grant rights to any other expert company to market and/or sell medical records support services to law firms or lawyers. (Agreement, § 3).

The Agreement provided that MedQuest agreed by the tenth day of each month to provide Trivent with a monthly transactional report summarizing all job orders by applicable client information including expenses and profits. Trivent would then submit an invoice to MedQuest on the basis of the transaction report. (Agreement, § 6.2).

Since 2017, Trivent has maintained two portals for Medical Records Support Services. One portal, the Trivent Portal was maintained as an access point for Trivent customers. The other portal, the Record Reform Portal, was maintained by Trivent and linked on the MedQuest website for MedQuest customers to access their accounts, review past services and bills, and place orders for new services. (Respondents' Pre-Brief at 2). The Record Reform Portal allowed MedQuest customers direct access to Trivent staff to ask questions, edit and review work products and manage their data. *Id*.

**Termination of Agreement**

The Agreement automatically renews on March 10th for a successive one-year term unless either Party provides written of notice non-renewal to the other Party at least sixty (60) days prior to the expiration of any subsequent renewal. (Contract § 2.1). Notably, the terms of the Agreement also automatically renew each successive year if MedQuest exceeds its prior year's base minimum revenues by an increase by 15% annually. *Id.*

The Agreement contemplates a transition period during a potential termination. Specifically, Section 2.2 of the Agreement states:

> In the event that the Agreement expires or is terminated, other than for Cause, MedQuest shall be entitled to continue providing MedQuest customers with access through its website to Trivent's Medical Records Support Services, and Trivent shall be entitled to continue providing its customers with Medical Expert Services, *for a period of one (1) year following the Termination date under the same fee structure and payment terms* utilized by the Parties prior to the Termination Date.

The Agreement also details the obligations of the Parties during a transition period. Specifically, Section 4.5 provides:

> MedQuest agrees not to solicit Trivent's competitors during the term of its exclusivity under this Agreement. MedQuest may negotiate with other medical records support providers during the six-month Transition Period.

Section 6.2 provides that MedQuest would continue to provide Trivent with a monthly transactional report and payment on the tenth of each month through the expiration of any transition period.

In the event of termination of the Agreement, Trivent must pay MedQuest post-termination fees of 50% of net revenues from sales of services to MedQuest customers during the one-year period following the transitional period. Additionally, during the two-year period following the expiration of the transition period, Trivent must pay MedQuest 25% of net revenues from sales of services to MedQuest customers. (Agreement, § 6.7).

In accordance with Section 2.2, Trivent would continue to pay MedQuest 100% of net revenues from sales of services to MedQuest customers during the one-year transition period.

Similarly, during a transition period, MedQuest must pay Trivent one-third of its net profits on all fees collected in connection with medical expert reviews attributed to Trivent during the one-year period following the transitional period. Additionally, during the two-year period following the expiration of the transition period, MedQuest must pay Trivent one-sixth of

its net profits on all fees collected in connection with medical expert reviews attributed to Trivent. (Agreement, § 6.8).

**The Parties' Dispute.**

In late 2021 or early 2022, Trivent approached MedQuest about a potential buyout of MedQuest; however, the Parties could not agree on a buyout price. A second discussion occurred regarding Trivent purchasing the Record Reform division of MedQuest but also without success. (Claimant's Pre-Brief at 5).

On January 6, 2022, Respondent Senguttavan forwarded an email to Mr. Stone requesting a time to discuss changing the terms of the Agreement prior to its renewal in March. (Exhibit B). Respondents argue that this email was Trivent's 60 days written notice of termination to MedQuest in accordance with the Agreement prior to the renewal date of March 10, 2022. (Respondents' Pre-Brief at 3).

Claimant states Respondents' purported notice was invalid because Section 2.1 of the parties' contract provided for an automatic renewal on an annual basis provided that MedQuest's income increased by at least 15%. At the hearing, Mr. Stone testified that MedQuest met the 15% annual increase because MedQuest annual income was 17% that year. Mr. Stone also testified that the exact numbers did not generate until sometime in the summer. (Claimant Pre-Brief, at 5, Elliot Stone Testimony, Hearing Day 1).

The Parties made attempts to draft a new contract. (Exhibit C, 18). Trivent would not agree to a clause that prohibited both Parties and their affiliates from soliciting Record Reform clients. (Claimant's Pre-Brief at 6). Both Parties acknowledged that neither Party had previously solicited either Party's customers based on a verbal agreement between them. (Elliot Stone and Leslie Inzunza Testimonies, Hearing Day 1, Sam Senguttuvan Testimony, Hearing Day 2).

5

On or about August 2, 2022, MedQuest's access to confidential medical records of thousands of lawyers was terminated without notice or warning. As a result, thousands of lawyers throughout the U.S. were abruptly denied access to their clients' information. Claimant states, as a result MedQuest has not had access to its confidential customer information since August 2, 2022. (Stone Testimony, Hearing Day 1).

On or about August 1, 2022, MedQuest launched a new website with a customer portal. (Exhibit E). Respondents argue that in doing so, the DNS link that had previously directed customers to the Record Reform portal now directed customers to the new MedQuest portal. The Record Reform portal still existed but the MedQuest customers no longer had direct access to it because the link had been replaced. (Respondents' Pre-Brief, at 6, Exhibit E).

On August 8, 2022, Trivent received its last orders from MedQuest. (Respondents' Pre-Brief at 8).

On August 29, 2022, Respondents informed Claimant that MedQuest had all of its clients' files for the months of June, July and August. (Exhibit M). In response, Claimant stated "these firms need ALL firm files - not just from last 1-2 months." Claimant added that some cases go back as far as July 2021. (Exhibit N).

On September 2, 2022, Respondent Roy Dixon forwarded an email to MedQuest's customer, Joel Brodd, a personal injury lawyer explaining that Trivent had ended its relationship with MedQuest. (Exhibit D). Respondent Dixon invited Mr. Brodd to discuss continuing to use Trivent to do its work for basically the same price and procedures. *Id.* Mr. Brodd responded that the termination of the relationships with Record Reform had a significant effect on his practice because he has ongoing cases with immediate need to access data and work product. (Exhibit D).

On September 7, 2022, Respondent Dixon forwarded an email to Mr. Brodd stating, "please let Record Reform know that they now have access to your data in the portal. (Exhibit Q).

Respondents argue between August 1, 2022, and September 14, 2022, when the Record Reform portal was closed, it was accessed by MedQuest customers 1,184 times. Respondents assert that Attorney Brodd accessed his data on the Record Reform portal on August 10th, August 22nd and August 23rd prior to his September email that he had no access to the portal. (Exhibit O). Respondents also point out that Claimant accessed the Record Reform portal 158 times during the same time frame. (Exhibit P).

On September 9, 2022, Claimant demanded that Trivent cease and desist use of MedQuest's service marks, tradenames and other intellectual property. (Exhibit 6).

On September 14, 2022, all access to the Record Reform portal was stopped. Respondents assert that this was in response to Claimant's cease and desist letter demand regarding trademark infringement within the Record Reform portal that Trivent had set up and maintained for MedQuest and its customers. (Exhibit R).

Respondents assert from August 22, 2022, to October 3, 2022, the Trivent Portal has been accessed at least 280 times by MedQuest customers who have not converted to Trivent customers. (Respondents' Pre-Brief at 10).

Claimant alleges Trivent unlawfully: (a) cut off MedQuest's access to its customers' confidential medical information; (b) engaged in direct solicitation of MedQuest customers; and (c) engaged in misleading misrepresentations to those customers. (Claimant's Pre-Brief at 12).

**Procedural History**

On September 27, 2022, Claimant served Respondents with a demand for arbitration referencing the emergency relief request. The emergency arbitrator was appointed on September 29, 2022.

On October 4, 2022, a preliminary hearing with the emergency arbitrator was held. Claimant's application for emergency relief was previously filed on October 4, 2022, and Respondents' opposition was due on October 11, 2022. On October 7, 2022, Claimant forwarded discovery requests to Respondents. On October 11, 2022, Respondents forwarded responses to discovery requests. On October 14, 2022, the Parties were scheduled to exchange their list of witnesses that would appear at the Emergency Relief Hearing scheduled for October 17, 2022, via Zoom. Due to an emergency, Claimant requested an adjournment until October 26, 2022. The Parties' exchange of witness lists was rescheduled to October 21, 2022

On October 26 and 28, 2022, an evidentiary hearing was held via Zoom.

## II.  Relief Sought by MedQuest

Consistent with AAA Rule 39, Claimant now seeks emergency relief: (a) an injunction directing Trivent to provide Claimant with immediate real-time access to all of its customer records and any summaries or synopsis of them; (b) temporarily enjoin Trivent and their affiliates from engaging in any direct or indirect solicitation of MedQuest customers pending resolution of the merits of the claim at a plenary hearing; (c) an order permitting attachment of Respondents' U.S. property up to a limit of $1 million; and (d) emergency limited discovery of the Respondents, including immediate disclosure of all emails, texts, brochures and marketing communications to MedQuest's customers.

### III. Legal Standard

The Parties' Agreement is silent regarding governing law.

AAA Rule 39(e) provides:

> "if, after consideration, the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief under applicable law, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore".

To obtain a preliminary injunction, a plaintiff must show (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest.

### IV. Analysis and Findings

**Likelihood of Success**

For eleven years, the Parties operated off the Agreement but in 2011, their relationship changed. Claimant alleges Respondent breached the Agreement by denying MedQuest access to its customers' data per the Agreement. Claimant argues Respondents' actions endangering MedQuest's entire business operation, causing it to lose numerous customers and placing it in immediate jeopardy of going out of business. (Claimant Pre-Brief, at 1).

The claimant also argues that on a daily basis, MedQuest is receiving panicked and anxious requests from its customers for medical records and prior work so that they cannot access the Trivent web-based storage system.

9

Pointing to the limitation of liability section of the Agreement, Respondents argue Claimant cannot establish a likelihood of success on the merits because loss of data is prohibited. Section 9 of the Agreement provides:

> In no event shall either party be liable to the other for any ***indirect, consequential, special, incidental***, punitive or exemplary damages of any kind including without limitation loss of profits, loss of data or equipment downtime, arising by way of contract, tort or other claims form damages, even if the party is apprised of the likelihood of such damages occurring.

This liability provision, to be operative as a limitation on MedQuest's available remedies, assumes that an indirect breach by Trivent has occurred. No such finding has yet been made in this arbitration. Moreover, Section 9, as written, does not exclude intentional causes of actions as alleged by MedQuest.

Respondents further argue that Claimant caused the lack of access when Claimant removed the Record Reform portal link from the MedQuest website. Respondents maintain the Record Reform portal is down now because MedQuest demanded that it be so. (Respondents' Pre-Brief, at 11).

The Parties dispute whether the Agreement was properly terminated. Respondents argue a proper notice of termination was submitted on or about January 10, 2022. Claimant argues this was during the negotiation stage and 17% increase was met so the Agreement automatically renewed.

The Agreement contemplated and detailed obligations during a potential termination of the Agreement. Yet, the Parties do not appear to agree if there was in fact, a termination and when it occurred or whether a breach occurred. In the event of a termination, the Agreement provides a transition period for Claimant and its customers. Respondents argue MedQuest's

clients have access to their data. Respondents also provided evidence that MedQuest was provided access to June, July and August 2022 data. Both Parties testified that the customers are personal injury attorneys who need access to data that can go back 3 to 5 years.

Accordingly, Trivent must provide MedQuest with access to all of its customers' data.

Turning to Claimant's request to enjoin Trivent and their affiliates from engaging in any direct or indirect solicitation of MedQuest customers pending resolution of the merits of the claim at a plenary hearing, Respondents argue the Agreement does not prohibit solicitation. Both Parties agree that the Agreement does not prohibit solicitation of either party's customers; however, each Party acknowledges that their longstanding practice was that neither Party would solicit either party's customers. The Parties also had a detailed arrangement for financial compensation in the event either Party accidentally acquire the other Party's customer.

Accordingly, neither party shall solicit the other party's customers during the pendency of this arbitration or until the merits arbitrator rules otherwise.

**Irreparable Harm**

Claimant argues that despite being in the business of providing medical record access for the past eleven years, it faces an existential crisis. Claimant argues it is losing customers on a daily basis. MedQuest points out that its customers are canceling orders and taking their business elsewhere, *i.e.,* to Trivent, its affiliates and competitors. Claimant adds it could be exposed to potential future lawsuits and claims from these customers. (Claimant's Pre-Brief at 2).

Claimant further argues its clients need access to their data going back 5 years or more. Claimant argues that prior to August 1, 2022, MedQuest and its clients had access to Trivent controlled portal with the ability to retrieve their data and confidential information.

Respondents maintain that Claimant's harm was self-inflicted. Respondents assert in August 2022, Trivent. acting as the customer support agent for MedQuest, handled at least 96 customer complaints regarding a combination of inability to access files or inability to login. (Respondents' Pre-Brief at 8).

Respondents point to an email thread stating security protocols and issues were never corrected nor satisfied in setting up the new MedQuest access point. (Respondents' Pre-Brief at 7, Exhibit F).

Respondents argue that it installed a banner within the Record Reform portal directing customers to the new MedQuest website and by August 10, 2022, the new RR portal link was operational and in Claimant's possession.

Claimant maintains its client attorneys are still harmed and humiliated by being forced to explain to judges and their clients why they cannot gain access to necessary medical records. Respondent maintains MedQuest customers have access. However, MedQuest does not have access to its customers' data in real-time or pre-June 2022 data. MedQuest maintains it has had access since August 2, 2022.

Claimant also argues that in addition to their customers' frustration, these customers are being solicited by Respondents. Claimant points to an email from Respondents instructing MedQuest's customers to retrieve their data by a certain date. (Exhibit K).

> "Please be informed that Record Reform was a reseller for Trivent Legal for 11 years, but the contract wasn't renewed this year. Trivent Legal has retained the

12

previous cases that you have sent to Record Reform and can be found in the Trivent Legal portal, but the case files will be there only until Nov 2022."

The Agreement contemplated a transition period in the event of a termination of the Agreement. The Parties should be able to work out the logistics for MedQuest to get access to all of its clients' data and information and transfer that information to MedQuest's portal.

Accordingly, the harm to MedQuest will be immediate and irreparable.

**Balance of Equities**

Respondents restated that the Agreement does not prohibit solicitation and the limitation of liabilities and has provided no arguments on this factor.

Claimant argues Respondents' actions endangering MedQuest's entire business operation, causing it to lose numerous customers and placing it in immediate jeopardy of going out of business.

Accordingly, Claimant stands to suffer immediate harm that cannot wait until the conclusion of the arbitration on the merits.

**Public Interest**

MedQuest provides summaries, record storage, organization and synopsis of voluminous medical records. Trivent provides medical records support services to personal injury lawyers. Neither party properly addressed this factor; however, the requested injunctive relief is of public interest because the services provided by Claimant and Respondents are beneficial to the public.

Accordingly, this factor favors granting injunctive relief.

**Request for Attachment of Respondents' Asset**

Claimant seeks an order attaching Respondents' U.S. property up to a limit of $1 million. Claimant argues because Trivent Systems Pvt. Ltd., is located in India that Respondents may hide its assets abroad. Claimant asserts that if this were to happen, the ultimate arbitration award and resulting judgment could prove to be unenforceable, thereby frustrating the purpose of the arbitration provision in the Parties' contract. (Claimant Pre-Brief, at 18).

The requirements for obtaining a prejudgment attachment order vary from state to state. The Parties' Agreement is silent regarding governing law. Claimant is located in New York and Respondents are located in Pennsylvania. Claimant points to the New York's Civil Practice Laws and Rules ("CPLR") Section 6201 which provides the grounds for when a party's assets may be attached.

CPLR 6201 provides in part attachment may be granted if:

> 1. the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or
> 2. the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so; or ….

An order of attachment is a lien against a defendant's property. As such, a prejudgment order of attachment increases the likelihood of recovery on a later-obtained judgment in the action. Claimant asserts that an arbitrator is empowered by the contract and law to grant any relief that would be available to a judge. (Claimant Pre-Brief, at 18).

Respondents argue that Claimant has not established that it would be entitled to a money judgment. Pointing to the "Limitation of Damages" section of the Agreement, Respondents argue damages based on loss data are restricted by the Agreement. (Respondents Pre-Brief, at 14).

14

At the hearing, Respondent Senguttuvan testified that Trivent's assets include its trademark and approximately $150,000 in the bank. Regardless, Claimant has not demonstrated at this preliminary stage of the arbitration that funds will not be available at the conclusion of the pending arbitration if Claimant were to succeed on the merits.

Accordingly, Claimant's request to attach Respondents' assets in the U.S. is premature and denied.

### Request for Emergency Limited Discovery

Claimant also requests limited discovery from Respondents including disclosure of emails, texts, brochures and marketing communications to MedQuest's customers. Respondents admit that Claimant has provided enough evidence to establish that Trivent has sent at least three different direct solicitations to MedQuest customers since the middle of August. (Respondents' Pre-Brief, at 16). Respondents point out that the emergency relief sought by Claimant to stop the direct solicitation of MedQuest customers would be sufficient to establish that solicitation is occurring.

Pursuant to the Parties' Agreement an arbitrator shall be selected after the completion of this emergency arbitration proceeding stage. Accordingly, Claimant shall submit its request for discovery to the merits arbitrator.

V.  **Award**

Having duly reviewed the papers submitted by the parties and heard testimony, the emergency request for injunctive relief is **GRANTED** as to the following:

1. Respondents are directed to provide MedQuest Ltd., with immediate real-time access to all of its customer records and any summaries or synopsis of them. Respondents Trivent and their affiliates are enjoined from engaging in any direct or

15

indirect solicitation of MedQuest customers pending resolution of the merits of the claim at a plenary hearing

2. Claimant's request for an order permitting attachment of Respondents' U.S. property up to a limit of $1 million is **DENIED**.

3. Claimant's request for emergency limited discovery of the Respondents, including immediate disclosure of all emails, texts, brochures and marketing communications to MedQuest's customers is **DENIED**.

4. All costs incurred by the Parties in connection with MedQuest Ltd.'s Request for Emergency Relief shall be borne equally, subject to any apportionment later determined by the merits arbitrator.

5. All requests for relief that are not expressly granted herein are **DENIED**.

6. This Interim Award of the Emergency Relief shall remain in full force and effect until the merits arbitrator is constituted and renders a decision on whether the injunction should be maintained through the pendency of the arbitration.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Interim Award of Emergency Relief was made in Newark, New Jersey, United States of America.

11/11/2022
Date

_____
Angela Foster, Emergency Arbitrator

State of New Jersey )
                       )   SS:
County of Middlesex)

I, Angela Foster, do hereby affirm upon my oath as Emergency Arbitrator that I am the individual described in and who executed this instrument, which is my Interim Award of Emergency Relief.

___11/11/2022___                                     _____
   Date                                            Angela Foster, Emergency Arbitrator