# EXHIBIT 2

CROSS-MARKETING AND SALES AGREEMENT

This Agreement is entered into as of March    , 2011, by and between **TRIVENT SYSTEMS INCORPORATED,** a Pennsylvania corporation, having an address at c/o Mr. Senguttuvan Shanmugam, 2274 Eldemere Circle, Macungie, PA 18062, **TRIVENT SYSTEMS PVT. LTD.,** an Indian company, having an address at 75, II Floor, M Block, III Avenue, Anna Nagar East, Chennai, Tamil Nadu 600 102 India (collectively, "TRIVENT"), and **MEDQUEST LTD.,** a New York corporation, having an address at 116 East 30th Street, New York, NY 10016 ("MEDQUEST"). TRIVENT and MEDQUEST are sometimes each referred to as a "Party" and collectively as the "Parties."

## RECITALS

A.   TRIVENT has established a business model pursuant to which users may electronically request medical records support services such as medical chronologies, record indexing and physician case opinions (collectively, "Medical Records Support Services") by scanning, downloading and sending documents to TRIVENT's offices in India, which perform the Medical Records Support Services; and

B.   MEDQUEST is a leading nationwide provider of medical expert services ("Medical Expert Services") to the legal industry; and

C.   TRIVENT desires MEDQUEST to package and sell Medical Records Support Services and other value-added services to MEDQUEST's current and prospective customers, which are not currently TRIVENT customers listed on the TRIVENT Customer Schedule annexed hereto[1] (collectively, "MEDQUEST Customers"); and

D.   MEDQUEST desires TRIVENT's sales representatives to sell Medical Expert Services to TRIVENT customers;

NOW THEREFORE, in consideration of the foregoing premises and the mutual agreements and covenants contained herein, the parties hereto agree as follows:

1.   **APPOINTMENT.**

   1.1   TRIVENT hereby grants MEDQUEST the exclusive right to sell Medical Records Support Services (i) to MEDQUEST Customers and (ii) within the marketing channel served by companies offering medical expert evaluation services and testimony, and MEDQUEST accepts such authorization, subject to the terms and conditions of this Agreement. The Parties acknowledge that TRIVENT is presently in strategic discussions to acquire the business of Med League, a New Jersey nurse and medical expert search firm ("Med League"). Should the transaction be completed on or before June 1, 2011, TRIVENT may sell Medical Records Support

---

[1] There may be customers on the TRIVENT Customer Schedule which are also currently customers of MEDQUEST. TRIVENT shall indicate on the Schedule which of these customers may be solicited by MEDQUEST.

3/10/2011                                                              1                                                              Execution Copy

        Services through Med League without breaching MEDQUEST's exclusivity rights under this Agreement.

1.2    MEDQUEST hereby grants TRIVENT the right to sell Medical Expert Services (i) to TRIVENT customers and (ii) within the marketing channel served by companies offering medical records support services also offered by TRIVENT, and TRIVENT accepts such authorization, subject to the terms and conditions of this Agreement.

2.    **TERM AND TERMINATION.**

2.1    The initial term ("Initial Term") of this Agreement shall be for a period commencing on the date of this Agreement and terminating two (2) years following the initial order for Medical Records Support Services through TRIVENT's link on MEDQUEST's website. This Agreement shall automatically be renewed for successive one (1) year terms under the same terms and conditions unless either Party shall give written notice of non-renewal to the other Party at least sixty (60) days prior to the expiration of the Initial Term or the expiration of any subsequent renewal term. The term of this Agreement shall be automatically renewed for an additional year upon expiration of the Initial Term if MEDQUEST generates Gross Revenues (as defined in Section 6.1 below) of at least $1,000,000 ("Base Minimum Revenues") during the second year of the Initial Term. The term of the Agreement shall continue to be automatically renewed for each successive year thereafter if MEDQUEST exceeds the prior year's Base Minimum Revenues, which shall increase by 15% annually. By way of example, the term of this Agreement shall automatically renew for a fourth year if Gross Revenues in the third year exceed $1,150,000, and shall automatically renew for a fifth year if Gross Revenues in the fourth year exceed $1,322,500.

2.2    Notwithstanding the foregoing, either Party may terminate this Agreement for Cause upon thirty (30) days written notice. "Cause" shall mean (i) material breach of this Agreement after written notice and a reasonable opportunity to cure, (ii) gross negligence, including intentional illegal or deceptive practices, (iii) insolvency, liquidation, receivership or bankruptcy of a Party, or (iv) MEDQUEST's failure to pay TRIVENT any amounts due hereunder within thirty (30) days of receipt of an invoice therefor from TRIVENT, subject to Section 6.3 below. The date upon which this Agreement expires pursuant to a non-renewal notice or is otherwise terminated is referred to as the "Termination Date." In the event that this Agreement expires or is terminated, other than for Cause, MEDQUEST shall be entitled to continue providing MEDQUEST Customers with access through its website to TRIVENT's Medical Records Support Services, and TRIVENT shall be entitled to continue providing its customers with Medical Expert Services, for a period of one (1) year following the Termination Date ("Transition Period"), under the same fee structure and payment terms utilized by the Parties prior to the Termination Date. In the event that this Agreement is terminated for Cause, except in the case of Section 2.2(iii), there shall be no Transition Period but the Parties shall be entitled to the Tail Fees described under Section 6 below. In the event that this Agreement is terminated for

Cause by reason of Section 2.2(iii), there shall be no Transition Period and no Tail Fee Period.

3. **OBLIGATIONS OF TRIVENT.**

   3.1   TRIVENT shall provide MEDQUEST with IT assistance, at no additional cost, to enable MEDQUEST's website to process orders for Medical Records Support Services, including delivery of completed work product and related functionalities.

   3.2   TRIVENT shall provide MEDQUEST Customers with Level II customer support in connection with Medical Records Support Services, at no additional cost.

   3.3   TRIVENT shall provide sufficient data communications connectivity to meet the needs of MEDQUEST Customers for access to the Medical Records Support Services.

   3.4   TRIVENT shall adhere to all guidelines specified by any and all state and federal legislative bodies maintaining jurisdiction over activities contemplated to be performed under this Agreement and shall not release information requested by MEDQUEST or MEDQUEST Customers to anyone other than MEDQUEST and/or the requesting MEDQUEST Customer unless required to do so by a court of competent jurisdiction.

   3.5   TRIVENT shall perform its obligations set forth throughout this Agreement to a standard not less than the level of performance provided by TRIVENT to its own customers.

   3.6   TRIVENT agrees that it shall not grant rights to any other company, firm or person engaged in the business of providing medical expert services, to market and/or sell Medical Records Support Services to law firms, lawyers, insurance companies and other third parties (i) during the Initial Term and (ii) for each one-year period thereafter, provided that MEDQUEST achieves the minimum sales revenue for the immediately prior year as set forth in Schedule B.

   3.7   In the event TRIVENT enters into negotiations for a marketing or sales agreement for Medical Records Support Services, or a merger or business acquisition agreement, with a company, firm or person whose primary business is other than offering expert evaluation services and testimony, TRIVENT will confer with MEDQUEST prior to finalizing any such agreement.

4. **OBLIGATIONS OF MEDQUEST.**

   4.1   MEDQUEST shall provide TRIVENT customers with Level II customer support in connection with Medical Expert Support Services, at no additional cost.

    4.2    TRIVENT shall generate customer invoices for MEDQUEST Customers obtaining Medical Records Support Services, provided, however, that MEDQUEST shall maintain sole responsibility for collection of any and all fees.

    4.3    MEDQUEST shall offer TRIVENT products on MEDQUEST's website in a mutually agreed upon manner.

    4.4    In any marketing of Medical Records Support Services, MEDQUEST shall not make any representation or warranty, with respect to Medical Records Support Services, broader than or inconsistent with any representation or warranty made by TRIVENT with respect to Medical Records Support Services in its then-current printed or electronic collateral material or with other written descriptions provided by TRIVENT to MEDQUEST from time to time hereunder.

    4.5    MEDQUEST agrees not to solicit TRIVENT's competitors during the term of its exclusivity under this Agreement. MEDQUEST may negotiate with other medical records support providers during the six-month Transition Period.

5    **RESTRICTION ON USE.**  Notwithstanding anything else to the contrary in this Agreement, TRIVENT shall not maintain any data and/or medical or other records resulting from Medical Records Support Services on its premises for sale to or use by anyone other than MEDQUEST or the original requesting Customer. TRIVENT shall have the right and obligation to maintain Medical Records Support Services data and resulting records sufficient enough to assure compliance with state and federal laws governing the use and dissemination of medical or other records.

6    **FEES AND PAYMENTS.**

    6.1    TRIVENT shall provide Medical Records Support Services in accordance with the schedule set forth in Schedule A ("Cost of Services"). The Parties shall subtract the Cost of Services from the gross fees actually collected from the customers ("Gross Revenues") to determine the net revenues ("Net Revenues") attributable to each job order. Eight (8%) Percent of total Gross Revenues shall be subtracted from Net Revenues and paid to MEDQUEST to reimburse it for general, administrative and sales expenses ("SGA Expenses"). The remaining balance after payment of SGA Expenses ("Net Profit") shall then be divided equally between MEDQUEST and TRIVENT. By way of example, if a particular purchase order incurs a Cost of Services of $60 and generates $100 in Gross Revenues, (i) Net Revenues shall equal $40 ($100 – $60), (ii) SGA Expenses shall equal $8 (.08 x $100), and (iii) each Party shall one-half of the Net Profit of $32, or $16 each (($40 – $8) x .50). This computation of Net Profit shall continue in effect during the Transition Period, if applicable; provided, however, that there shall not be an 8% deduction for SGA Expenses during the Tail Fee Period described in Section 6.7 below.

    6.2    MEDQUEST shall provide TRIVENT by the tenth (10th) day of each month following the end of the month in which MEDQUEST is in receipt of Gross Revenues, with a monthly transactional report ("Transactional Report") summarizing

all job orders by applicable client name, client number and aggregate billings for that month, and including a breakdown of Net Revenues, SGA Expenses and the portion of Net Profit payable to TRIVENT. TRIVENT shall then submit an invoice to MEDQUEST on the basis of the Transactional Report. This payment protocol shall continue in effect through the expiration of any Transition Period.

6.3   MEDQUEST shall pay TRIVENT invoices within ten (10) days from receipt thereof. If there are any good faith disputes related to an invoice, MEDQUEST shall pay the undisputed portion of the invoice on a timely basis and notify TRIVENT in writing of MEDQUEST's basis for withholding payment of the disputed amount. Upon receipt of MEDQUEST's dispute notice, TRIVENT and MEDQUEST shall work together in good faith to resolve such dispute in a prompt and mutually acceptable manner. If the dispute is not resolved within thirty (30) days after MEDQUEST's receipt of TRIVENT's dispute notice, the Parties shall resolve the issue pursuant to the provisions of Section 16 below. MEDQUEST shall pay any disputed amounts within five (5) business days after all questions have been resolved.

6.4   TRIVENT and/or its affiliates shall be solely responsible for payment of all taxes imposed in India, including, without limitation, any charges, fees, duties, levies, imposts, rates or other assessments imposed by any federal, state, or local taxing authority, including, but not limited to, income, profits, gross receipts, excise, property, license, capital stock, franchise, transfer, payroll, withholding, social security, other employment tax or other taxes, and any interest, penalties or additions attributable thereto assessed or levied against TRIVENT and/or its affilaites in respect of the services performed under this Agreement ("Taxes"). TRIVENT shall hold MEDQUEST, its officers, directors, employees and agents harmless from any non-payment or underpayment of such Taxes.

6.5   The Cost of Services payable by MEDQUEST Customers (as set forth in Schedule A) shall be equal to or better than the fees charged by TRIVENT to other distributors/resellers of the same products and services to the legal market.

6.6   With regard to the sale of Medical Expert Services by TRIVENT, MEDQUEST contemplates paying (i) to TRIVENT's sales representatives $25 for each Curbside Counsel free evaluation order solicited by a TRIVENT salesperson ("Evaluation Fee") and (ii) to TRIVENT 1/3 of the net profit (gross fees less fees paid to medical experts) on all fees collected in connection with medical expert reviews attributable to orders solicited by a TRIVENT salesperson, including any additional reviews attributable to such client, subject to Section 6.7 below; provided, however, that the $25 Evaluation Fees with respect to such client shall terminate once the salesperson is no longer representing or otherwise affiliated with TRIVENT. Final compensation arrangements and reporting requirements shall be determined by the Parties within thirty (30) days of the date of this Agreement.

6.7   Except as otherwise provided in Section 2.2, following termination of this Agreement and expiration of the Transition Period, TRIVENT shall pay MEDQUEST post-termination fees ("Tail Fees") of (i) 50% of Net Revenues from

all sales of Medical Records Support Services to MEDQUEST Customers during the one-year period following the expiration of the Transition Period and (ii) 25% of Net Revenues from all sales of Medical Records Support Services to MEDQUEST Customers during the immediately succeeding one-year period (the two-year period immediately following the expiration of the Transition Period is referred to as the "Tail Fee Period"). At the expiration date of the one-year Transition Period, (i) MEDQUEST shall submit a list of protected customers, which will include all MEDQUEST Customers that have ordered Medical Records Support Services during the one-year period prior to such date and (ii) MEDQUEST shall remove the Medical Records Support Services link/feature from its website. By the 10th day of each month during the Tail Fee Period, TRIVENT shall submit a monthly report of Gross Revenues collected from MEDQUEST Customers during the prior month. The report shall list the name of each Customer, Gross Revenues collected from such Customer and the Net Revenues. All Tail Fee payments due to MEDQUEST shall be paid within thirty (30) days of the end of the month for which such report is required to be delivered to MEDQUEST. These Tail Fee provisions shall be subject to the inspection rights set forth in Section 17.4 hereunder.

6.8 Except as otherwise provided in Section 2.2, following termination of this Agreement and expiration of the Transition Period, MEDQUEST shall pay tail fees to TRIVENT of (i) 1/3 of the net profit on all fees collected in connection with medical expert reviews attributable to orders solicited by a TRIVENT salesperson during the one-year period following the expiration of the Transition Period and (ii) 1/6 of the net profit on all fees collected in connection with medical expert reviews attributable to orders solicited by a TRIVENT salesperson during the immediately succeeding one-year period.

7. **REPRESENTATIONS AND WARRANTIES.** Each Party represents and warrants to the other Parties that such Party has full power and authority to enter into this Agreement, that all requisite approval was obtained prior to entering into this Agreement, and this Agreement is binding upon such Party in accordance with the terms and conditions herein.

8. **INDEMNITY.**

   8.1 TRIVENT shall defend, protect, indemnify and hold MEDQUEST harmless from and against all costs, expenses and damages, including reasonable attorney's fees, attributable to any claim that use of any Medical Records Support Services provided hereunder infringes upon any proprietary or contractual right of a third party or breach of applicable law, provided that (i) MEDQUEST gives prompt written notice of any such claim, and (ii) TRIVENT is given full control over the defense of such claim and receives the full cooperation of MEDQUEST in the defense thereof. The obligation under this section shall survive any termination of this Agreement. TRIVENT shall not have the right to settle any claims against MEDQUEST without MEDQUEST's prior written consent, such consent not to be unreasonably withheld or delayed.

    8.2    MEDQUEST shall defend, protect, indemnify and hold TRIVENT harmless from and against all costs, expenses and damages, including reasonable attorney's fees, attributable to any claim that use of any Medical Expert Services provided hereunder infringes upon any proprietary or contractual right of a third party or breach of applicable law, provided that (i) TRIVENT gives prompt written notice of any such claim, and (ii) MEDQUEST is given full control over the defense of such claim and receives the full cooperation of TRIVENT in the defense thereof. The obligation under this section shall survive any termination of this Agreement. MEDQUEST shall not have the right to settle any claims against TRIVENT without TRIVENT's prior written consent, such consent not to be unreasonably withheld or delayed.

9. **LIMITATION OF DAMAGES.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION LOSS OF PROFITS, LOSS OF DATA OR EQUIPMENT DOWNTIME, ARISING BY WAY OF CONTRACT, TORT OR OTHER CLAIMS FOR DAMAGES, EVEN IF THE PARTY IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

10. **DEFAULT.**

    10.1    Either Party (hereinafter the "Defaulting Party") shall be in default upon the occurrence of any one of the following events: (i) failure to perform any term, condition or covenant of this Agreement and such failure shall continue for a period of thirty (30) days after receipt of written notice thereof; (ii) if the Defaulting Party ceases the conduct of active business; (iii) if any proceedings under the Federal Bankruptcy Act or other insolvency laws shall be instituted by or against the Defaulting Party or if a receiver shall be appointed for the Defaulting Party or any of its assets or properties; or (iv) if the Defaulting Party shall make an assignment for the benefit of creditors.

    10.2    Upon any default that remains uncured after the notice required above, the non-defaulting Party may terminate this Agreement by providing thirty (30) days written notice of its intent to do so. Any termination shall be without prejudice to any other rights or remedies which the non-defaulting Party may have against the Defaulting Party with respect to such default, except as limited herein.

11. **USE OF TRADEMARKS AND LOGOS; ADVERTISING.**

    11.1    Neither Party shall use in any advertising, sales promotion, letterhead, publicity or other public or media communications, any trade name, trademark, service mark, logo or similar other identification or abbreviation, contraction or simulation thereof owned by the other Party without the prior written consent of the other Party.

    11.2    Neither Party shall advertise or in any way publicly announce through any media that it has entered into this Agreement without the consent of the other Party.

11.3 Each Party shall have the right to review any and all materials bearing such Party's trade name, trademark, service mark, logo or similar other identification or abbreviation, contraction or simulation thereof for the purposes of exercising its right of quality control over such items.

12. **EXCUSABLE DELAY.** Neither Party hereunder shall be liable to the other for any delay in the time for performance of its obligations under this Agreement is such delay arises out of circumstances beyond its reasonable control, including but not limited to strikes, wars, natural disasters, equipment failure or breakdown, governmental regulation or interference, or other calamity. In the event of any such excusable delay, the time for the performance of such obligations shall be extended for a period equal to the length of the delay. The Party whose performance is hampered by the excusable delay shall provide written notice to the other Party as soon as reasonably possible of the occurrence of the delay, but in no event later than three (3) business days, provide a description thereof, and exercise its best efforts to remove such cause of non-performance. All other obligations not affected by the excusable delay shall be in force and effect during the period of time that the affected obligation is suspended during the continuance of such excusable delay. If an excusable delay arises out of equipment failure or breakdown, and such delay results in a failure of performance, which continues for a period of ninety (90) consecutive days, the non-defaulting Party, by notice in writing to the other, may state its intention to terminate this Agreement. Upon receipt of such written notice the defaulting party will have thirty (30) days to cure such default and avoid termination.

13. **NOTICES.** All notices required to be given under this Agreement shall be in writing and may be delivered (i) by certified or registered mail, postage prepaid, (ii) by hand, or (iii) by any nationally recognized commercial overnight courier specifying next day delivery. Such notices shall be mailed or delivered to the addresses set forth below or such other address as a Party may notify the other Party of in writing. Notices shall be effective (i) if mailed, on the date three (3) days after the date of mailing or (ii) if hand delivered or delivered by overnight courier, on the date of delivery.

      To MEDQUEST:    MEDQUEST, LTD.
                                       116 East 30TH Street
                                       New York, NY  10016
                                       Attn: Elliot Stone, Pres.

      To TRIVENT:      TRIVENT SYSTEMS INCORPORATED
                                       TRIVENT SYSTEMS PVT. LTD.
                                       c/o Mr. Senguttuvan S. Shanmugam
                                       2274 Eldemere Circle
                                       Macungie, PA 18062

14. **RELATIONSHIP OF THE PARTIES.** The parties hereto agree that the relationship of the parties created by this Agreement is that of independent contractor and not that of employer/employee, principal/agent, partnership, joint venture or representative of the other. Except as authorized hereunder, neither Party shall represent to third parties that it is the

employer, employee, principal, agent, joint venture or partner with, or representative of the other Party.

15. **NONDISCLOSURE.**

   15.1 Each Party agrees that it will use the same degree of care and discretion to avoid disclosure or dissemination of the other Party's Confidential Information to anyone other than those employees with a need to know for purposes of this Agreement as it uses with information it does not wish to have published, disclosed or disseminated. Neither Party will use the other's Confidential Information without the prior written consent of the other Party. For purposes of this Agreement, "Confidential Information" means, without limitation, any information relating to either Party's product plans, specification, designs, development, costs or trademarks, or relating to its finances, marketing plans, business opportunities, personnel, research or know-how.

   15.2 The Parties agree that they have no obligation to keep confidential any information that: (i) is or becomes generally known or available by publication, commercial use or otherwise through no fault of the receiving party; (ii) is known and has been reduced to tangible form by the receiving party at the time of disclosure and is not subject to restriction; (iii) is independently developed by the receiving party; (iv) is lawfully obtained from a third party who has the right to make such disclosure; or (v) is released for publication by the disclosing party in writing.

16. **DISPUTE RESOLUTION.**

   16.1 TRIVENT and MEDQUEST understand and agree that the implementation of this Agreement will be enhanced by the timely and open resolution of any disputes or disagreements between such Parties.

   16.2 Each Party agrees to use its best efforts to cause any disputes or disagreements between such Parties to be considered, negotiated in good faith, and resolved as soon as possible.

   16.3 In the event that any dispute or disagreement between the Parties cannot be resolved to the satisfaction of TRIVENT and MEDQUEST within ten (10) days after either Party has notified the other in writing of the need to resolve the specific dispute or disagreement within such ten-day period, then either Party may submit the dispute for final and binding arbitration as provided in Section 16.4. Notwithstanding the provisions of this Section 16.3, neither Party shall be required to use this dispute escalation procedure if there is an actual or alleged violation of such Party's Confidential Information, and, as to such actual or alleged violation, either Party reserves all rights to seek judicial remedies and relief, including, without limitation, any injunctive relief that may be granted by any court of competent jurisdiction, without requirement of posting a bond.

16.4 Any dispute between the parties arising out of or resulting from this Agreement that is not resolved through negotiation pursuant to Section 16.3, shall be settled exclusively by final and binding arbitration in accordance with the following:

(a) except as specified below or otherwise agreed in writing, the arbitration shall be conducted in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association (such organization, the "AAA" and such rules, the "AAA Rules");

(b) the arbitrator shall be one neutral person selected by agreement of the Parties or, failing such agreement in the thirty (30) day period after the initial list of available arbitrators has been provided to both parties by the AAA, in accordance with the AAA Rules. Unless otherwise agreed in writing by the Parties, the arbitrator shall be an experienced business attorney;

(c) the arbitration proceedings shall take place in Newark, New Jersey;

(d) each party to the arbitration shall bear its own legal fees, costs and expenses of the arbitration; and

(e) judgment upon the award rendered in the arbitration may be entered in any court of competent jurisdiction.

17. **MISCELLANEOUS PROVISIONS.**

17.1 Section headings are for convenience only and will not be construed as part of this Agreement. This Agreement shall be construed and interpreted according to its fair meaning and without regard to any presumption or other rule requiring construction against the party drafting or causing this Agreement to be drafted.

17.2 No action arising out of this Agreement, regardless of form, may be brought by any Party more than one (1) year after the cause of action has accrued. The cause of action shall be deemed to have accrued at such time as the damaged Party becomes knowledgeable of the occurrence (s) giving rise to such action.

17.3 Neither party shall assign this Agreement, unless such assignment is to a successor, parent or subsidiary company. The terms, conditions and obligations of this Agreement shall inure to the benefit of and be binding upon the parties hereto and the respective permitted successors and permitted assigns thereof.

17.4 Each Party shall have the right to inspect the other Party's facilities, books and records from time to time upon at least seventy-two (72) hours advanced written notice to ensure compliance with and performance of this Agreement, not to exceed two times a year. TRIVENT shall grant MEDQUEST's representative and MEDQUEST shall grant TRIVENT's representative reasonable access, via the internet, to all financial and other information requested by MEDQUEST or

TRIVENT, whichever the case, to assist it to effectively comply with the terms of this Agreement.

17.5  This Agreement together with the Schedules hereto, which are fully incorporated herein, contains the complete and exclusive agreement between the parties relating to the subject matter herein. This Agreement supersedes, and the terms of this Agreement govern, any prior or contemporaneous agreements, understandings, representations, communications or proposals, oral or written, between the parties relating to the subject matter of this Agreement, all of which are merged herein. No statements in writing subsequent to the date of this Agreement purporting to modify or add to the items and conditions hereof shall be binding unless consented to in writing by duly authorized representatives of MEDQUEST and TRIVENT in a document making specific reference to this Agreement. This Agreement may by executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17.6  No waiver of any breach of any provision of this Agreement shall constitute a waiver of a prior, concurrent or subsequent breach of the same or any other provisions hereof and no waiver shall be effective unless made in writing and signed by an authorized representative. In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid or illegal or unenforceable provision has never been contained herein.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**MEDQUEST, LTD.**

By: _Elliot Stone, CEO_
Its: _Elliot Stone_
Date: _3/10/11_

**TRIVENT SYSTEMS INCORPORATED**

By: _SENGUTTUVAN SHANMUGAM_
Its: _[signature] President_
Date: _3/10/11_

**TRIVENT SYSTEMS PVT. LTD.**

By: _SENGUTTUVAN SHANMUGAM_
Its: _[signature] Director_
Date: _3/10/2011_

**SCHEDULE A**

## Schedule of Cost of Services/Customer Charges

Medical Record Chronologies, Timelines and Other Non-medical Opinion Services: $15 per hour cost payable to Trivent (India); $35 per hour retail price to customers (initial pricing)

Independent Contractor Opinion - Physicians: $50 per hour cost payable to Trivent (India); $75 per hour retail price to customers (initial pricing)

20% expedite fee for delivery of the foregoing services in less than one week


NOTE: Once each year, TRIVENT may request MEDQUEST to consent to an increase in the Cost of Services based on a substantiated increase of its cost of inputs, which consent may not be unreasonably withheld.

**SCHEDULE B**

## Minimum Sales Revenue

- $1,000,000 in Year 2
- 15% increase annually after Year 2

# Trivent Systems Inc
## Customer Contact List
### March 9, 2011

Bill To

---

Adelman & Adelman PA 8020 Wiles Rd

Airola law offices John Airola 2399 American River Dr Suite 2

Albert G.Stoll 55 Francisco Street Suite 403  San Francisco California 94133

Anthony Carbone, PC 601 Pavonia Avenue, 2nd Floor Jersey City, NJ 07306-2922

Arnold Lawfirm Clifford Carter 865 Howe Avenue Sacramento, CA 95825

Atkins & Associates Pamela Atkins 117 Permimeter Center West Suite W 405 Atlanta, GA 30338

Audet & Partners LLP 221 Main street Suite 1460 San Francisco, CA 94105

Billings, Morgan & Boatwright, LLC 399 Carolina Avenue,Suite 100 Orlando, Winter Park, Florida 32789

Bodoin, Agnew, Greene & Maxwell, P.C. Burnett Plaza, Suite 3450 801 Cherry Street, Unit 31 Fort Worth, TX 76

Bohn & Bohn, LLP 152 N. Third St, Suite 200 San Jose, , CA 95112

Brennan, Holden & Kavouklis, P.A 117 Avenue B SW Winter Haven, FL 33880

Burns, Cunningham & Mackey, P.C Diana Prescher P.O. Box 1583 Mobil AL 36633

Canelo Wilson Wallace & Padron 548 West 21st Street,PO boX 216, Merced 95344 California

Joseph Catania 101 E. Kennedy Blvd Suite 2400 Tampa, FL 33602

Cavanagh Law Group 161 N. Clark St, Ste. 2070 Chicago, IL 60601 312-425-1900

Champion Law LLC 3252 Rice Street St. Paul, MN  55126

Chase Kurshan Herzfeld & Rubin, LLC Peter J Kurshan 354 Eishenhower Parkway Suite - 1100 Livingston, NJ 0

Chenault Hammond, P.C. 117 Second Avenue, N.E. P.O. Box 1906 Decatur, AL 35602

Childers, Schlueter & Smith, L.L.C. Andrew Childers 1932 N. Druid Hills Road Suite 100 Atlanta, GA 30319

Cochran, Foley & Associates, P.C. 15510 Farmington Road Livonia, Michigan 48154

Cory, Watson, Crowder & DeGaris, P.C. Stephen R Hunt, Jr 2131 Mangolia Avenue, Suite 200 Birmingham, AL

DarrasLaw 3257 E. Guasti Road, Suite 300 Ontario, CA 91761

Demas & Rosenthal LLP John Demas 710 Howe Avenue Sacramento, CA 95825

Diez-Arguelles & Tejedor Carlos Diez 550 N Mills Avenue Orlando, FL 32803

5100 PGA Blvd Suite 317 Palm Beach Gardens, FL 33418

Dudley DeBosier Injury Lawyers Steve DeBosier 1075 Government Street Baton Rouge, LA 70802

FLETCHER, FARLEY, SHIPMAN & SALINAS, LLC 8750 N. Central Expressway 16th floor Dallas, Tx 75231

Frank M. Ferrell, APLC Frank M Ferrell 631 Milam, Ste. 100 Shreveport LA 71101

Frazer, Greene, Upchurch & Baker, LLC 104 St. Francis Street, Suite 800 Mobile, Alabama 36602

Frenkel & Frenkel, LLP Mark Frenkel 12700 Park Central Drive Suite 1900 Dallas, TX 75251-1508

Friedlander, Friedlander & Arcesi, PC 425 Park Avenue Waverly, NY 14892

Friedman law Offices 3800 Normal Blvd., Suite 200 P.O. Box 82009 Lincoln, NE 68501

Gallon Tackas Boissoneault & Schaffer 3516 Granite Circle Toledo, OH 43617

Galloway Jefcoat, LLP John Jefcoat 1925 Dulles Dr Lafayette, LA 70596

Glasheen, Valles & DeHoyos, L.L.P. Kristie Sauseda 1302 Texas Ave. Lubbock, , TX 79401

Goldenberg & Johnson, PLLC. 33 South Sixth St, Suite 4530, Minneapolis MN 55402

Goldsmith Ctorides & Rodriguez 1400 Sylvan Avenue Englewood Cliffs, NJ 07632

HASBROOK & HASBROOK Clayton Hasbrook 2700 First National Center 120 N Robinson Avenue Oklahoma C

Hazelton lawfirm P.O Box 1248 Bemidji, MN 56619

Heard and Smith 3737 Broadway Ste. 310 San Antonio, TX 78209

Heimerl & Lammers, LLC Benjamin  J Heimerl 901 North Third Street, Suite 110 Minneapolis, MN 55401

Heintz & Becker Steven Heintz 2424 Manatee Avenue West Suite 201 Brandenton, FL 34205

Howard L. Wexler, Esq Herzfeld & Rubin , PC 124 Broad Street New York, NY 10004

Donald M Hinkle Hinke & Foran 3500 Financial Plaza, Suite 530 Tallahassee, FL 32312

Holliday, Bomhoff, Karatinos P.L. Attorne 18920 N. Dale Marby Highway Suite 101 Lutz, FL 33548

# Trivent Systems Inc
## Customer Contact List
### March 9, 2011

Bill to

| |
|---|
| Horowitz, Tannenbaum & Silver, P.C. Mr Tannenbaum 2001 Marcus Avenue Lake Success, NY 11042 |
| Horwitz, Horwitz & Associates 25 E. Washington, Suite 900 Chicago, IL 60602 |
| Houssiere, Durant & Houssiere, LLP Monica C Vaughan 1990 Post Oak Blvd, Suite 800 Houston, TX, 77056 |
| Hughes & Coleman Injury Lawyers 1256 Campbell Lane Suite 201 Bowling Green, KY 42104 |
| Itizler & Itizler Peter E Itzler 1421 S.E , 4th Avenue, Suite A Fort lauderdale, FL 33316 |
| 1408 W Pinhook Rd S Lafayette, LA 70503-3157 Toll Free: 877-567-4351 |
| Jan Dils, Attorneys at Law, LC Jan Dils 1037 Market St Parkersburg, WV 26101 |
| John Feroleto 910 Main Court Building 438 Main Street Buffalo, NY 14202 |
| 700 College Avenue, Santa Rosa CA 95404 |
| Kampf Schiavone & Associates Attn: Mr Schiavone 715 Arrowhead Avenue Suite 104 San Bernardino, CA 9240 |
| Katz, Step & Wright, LLC Resurgens Plaza Suite 2610 945 East Paces Ferry Rd Atlanta, GA, 30326 |
| Keefe Disability Law 31 Janes Avenue Medfield, MA 02052 |
| Keesal, Young & Logan 1301 Fifth Avenue Seattle, WA 98101 |
| Kershaw, Cutter & Ratinoff LLP 401 Watt Avenue, Sacramento, CA 95864 |
| Klein DeNatale Goldner Cooper Rosenlieb & 4550 California Ave. 2nd Floor Bakersfield, CA 93309 |
| Kohn, Needle & Silverman 1763 Spring Field Ave Maple Wood NJ 07040 |
| Larry Curtis, APLC Larry Curtis 300 Rue Beauregard, Bldg. "C" Lafayette, LA 70508 |
| Law offices of David B Golomb David B Golomb New York, NY |
| LAW OFFICES OF DAVID L. MILLIGAN, PC David Milligan 7170 N. Financial Drive, Suite 101 Fresno, California |
| Law offices of Jason A Waechter Jason Waechter 19080 W Ten mile Road Southfield, MI 48075 |
| Law Offices of Matthew W. Dietz, P.L. 2990 Southwest 35th Avenue Miami, FL 33133 |
| Levinson Axelrod Rosemary McGeady 2 Lincoln Highway P.O Box 2905 Edison, NJ 08818 |
| Lomurro, Davison, Eastman and Muñoz Monmouth Executive Center 100 Willowbrook Road Building #1 Freeho |
| Lopez McHugh LLP 100 Bayview Cir Suite 5600 Newport Beach, CA 92660 |
| Lynch Law Firm, PC. 45 Eisenhower Drive, 3rd Floor Paramus, NJ 0765 |
| Magnuson Lowell PS 8201 164th Avenue NE Suite 200 Redmond WA 98052 |
| Martin Walker Reid Martin 522 S. Boradway, Suite 200 Tyler, TX 75702 |
| Mary Alexander 44 Montgomery Street Suite 1303, San Francisco, CA 94104 |
| McWhirter, Bellinger & Associates, P.A. 119 East Main Street Lexington SC 29072 |
| Miller & Chevalier 655 Fifteenth Street, NW Suite 900 Washington, DC 2005-5701 |
| Montes Herald Law Group, LLP 1121 Kinwest Parkway Suite 100 Irving, TX 75063 |
| Morgan & Morgan 76 South Laura Street Suite 1100 Jacksonville, FL 32202 |
| Munley, Munley Cartwright, PC Marion Munley Forum Plaza 227 Penn Avenue Scranton, PA 18503 |
| Nesci Keane Piekarski Keogh & Corrigan Vincent Nesci 40 Saw Mill River Rd Suite UL1 Hawthorne, NY 10532 |
| Neuhardt Lawfirm, PC 945 Broadwater Square Billings, Montana 59102 |
| O'Connor, Acciani & Levy, Co., LPA 2200 Kroger Building 1014 Vine Street Cincinnati, OH 45202 |
| Payas & Payas & Payas 108 E. Robinson Street Orlando, FL 32801 |
| Perantinides & Nolan Paul Perantinides 300 Courtyard Square 80 South Summit Street Akron, OH 44308 |
| Podhurst Orseck, P.A. City National Bank Building 25 West Flagler Street, Suite 800 Miami, FL 33130 |
| Ralston, Pope & Diehl, LLC 2913 SW Maupin Lane Topeka, KS 66614 |
| Rhonda Davis & Associates, LLC 159 South Main Street Key Bank Building, Suite 1111 Akron, OH 44308 |
| Riccolo & Semelroth Tim Semelroth 425 Second Street SE Suite 1140 Cedar Rapids, IA 52401 Cedar Rapids |
| Roland Brown Law offices P.O Drawer 279 Jacksonville, TX 75766 |
| Rosner Law offices, PC 311 Landis Avenue Vineland, NJ 08360 |
| Rothenberg & Pashaiyan 2444 Morris Avenue # 206 Union, NJ 07083 |

# Trivent Systems Inc
## Customer Contact List
### March 9, 2011

Bill to

200 East Broward Boulevard Suite 1500 Ft. Lauderdale FL 33301

Scott H. Palmer, P.C 3232 McKinney Avenue, Dallas, TX 75204mer, P.C.

Sevenish law firm 251 E. Ohio Street Suite 880 IndianaPolis, IN 46204

Shergill Lawfirm Amar Shergill 2150 River Plaza Drive, Suite 295 Sacramento, CA 95833

Daniel P. Miklos, Esq. 600 Old Country Road Garden City NY 11530

Simonson Hess & Leibowitz, P.C. 2500 Plaza 5 Harbor Side Financial Center Jersey City, NJ 07311

Sinclitico & Burns, PLC Hugh Burns 330 Golden Shore, Suite 410 Long Beach, CA 90802

Slappey & Sadd, LLC Jay Sadd 352 Sandy Springs Cir NE Atlanta, GA 30328

Sloan, Bagley, Hatcher & Perry Law Firm P. O. Drawer 2909 Longview, Texas 75606

Spangenberg, Shibley & Liber LLP 1900 E. 9th street Suite 2400 Cleveland, OH 44114

Stark & Stark P.O Box 5315 Princeton, NJ 08543

Stillman & Friedland Jay Friedland 208 23rd Avenue North Nashville, TN 37203

Sullivan Law Office 1500 Storey Ave Louisville, KY 40206

Taylor, Odachowski, Schmidt & Crossland,LLC 300 Oak Street, Suite 200 St Simons Island, GA 31522

Ted A. Greve Associates Ted A Greve 1201 North Tryon Street Charlotte, NC 28206

The Arns Law Firm 515 Folsom Street, 3rd Floor San Francisco, CA 94105

The Johnson Firm Price L Johnson 8750 N central Expressway Suite 1010 Dallas, Tx 75231

Law office of Thomas J Henry Thomas Henry 521 Starr Street Corpus Christi, TX 78401

Thomas, Means, Gillis & Seay, PC Eugene Felton 191, Peachtree St, NE, Suite 3550 Atlanta, GA 30303

Thomas, Means, Gillis & Seay P.C 3121 Zelda Court P.O Box 5058 Montgomery, AL 36103-5058

Wagner, Vaughn & Mclaughlin Alan Wagner 610 Bayshore Blvd Tampa, FL 33602

Walter Clark Legal group Attn : Chapa 4-075 El Paseo Palm Desert CA 92260

William & Morgan William Walker P. O. Box  949 135 E. Main Street Lexington, SC 29072

Yonke & Potenger, LLC 1100 Main Street, Suite 2450 Kansas City, MO 64105